UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:02CR178 (EBB) |
| v. | : | |
| ORETAGUS EADDY, | : | |
| Defendant. | : | August 16, 2005 |

### SENTENCING MEMORANDUM OF ORETAGUS EADDY

**I.    Preliminary Statement**

The defendant, Oretagus Eaddy, comes before Your Honor after having plead guilty to Conspiracy to Possess With Intent to Distribute More Than 5 Grams of Cocaine Base in violation of 21 U.S.C. §§841(a)(1), (b)(1)(B) and 846. The defendant's conviction arises from his participation, along with two others, in a conspiracy to sell narcotics to an undercover agent.

Mr. Eaddy plead guilty more than three years ago – on August 2, 2002. Next week he will stand before this Court as a 28 year old who takes full responsibility for his role in this offense. He awaits sentence with a level of maturity that now causes him to look back with regret on the foolish decisions made as a 15 year old that inevitably brought him before this Court. Not unlike many other young men from Bridgeport, Mr. Eaddy's life has been largely influenced by the decision he made at the age of 15 to choose the life of a drug dealer over that of a student. However, unlike his former peers from the streets, Mr. Eaddy now distinguishes himself by his mature acceptance of responsibility, his extraordinary efforts as a cooperating witness for the Government and his commitment to his children and himself that no matter what challenges lie ahead he will never again return to the sale of illegal drugs.

Because Mr. Eaddy has provided extraordinary assistance to the Government in the face of intimidation and threats and because we expect that he will impress Your Honor with his genuine acceptance of responsibility and his firm commitment to support his children as a law-abiding and loving father, we respectfully urge the Court to substantially depart downward from the calculated range suggested by the Guidelines.

**II.     Background**

Oretagus Eaddy is 28 years old. He grew up in Bridgeport. His early childhood was unremarkable. While his mother and father were estranged from one another and Oretagus lived at times with one or the other, he mostly enjoyed a loving and supportive family life. A bright student, he caused few problems for his father, mother and step-father.

Oretagus was from modest means. By the age of 15 he found that he was envious of the money and excitement that seemed to follow the neighborhood crack dealers. He was a 10th grader at Harding Prep. One day after school he and a friend were asked by members of a street-level drug gang ("Q&A") to sell crack/cocaine. Within a short time after agreeing to sell drugs for the gang Oretagus was enjoying the money and excitement that many of his teenage peers longed for. His involvement in the drug trade grew quickly into a daily routine and before he completed the 10th grade Oretagus had dropped out of school. Instead of taking daily directions from teachers at school, Oretagus was now answering to Quin Powell, the leader of the Q&A gang, at one of Powell's many drug selling spots on the East Side of Bridgeport.

By the age of 17, Mr. Eaddy was sentenced to 4 years in jail on a state charge for sale of narcotics. After his first jail sentence Mr. Eaddy returned to drug dealing only again to be

arrested and sent to state prison for possession of narcotics.

In December 1998, Mr. Eaddy was again released from jail. During this period of incarceration Mr. Eaddy used the time to obtain his High School equivalency or GED. During the six months following his release Mr. Eaddy was assigned to live in a halfway house and utilized that time to obtain training in the field of food service. Thereafter, Mr. Eaddy obtained jobs through temp agencies. In November 1999, he was hired as a cook in the cafeteria of Sacred Heart University.

In January 1998, Mr. Eaddy's girlfriend, Chandra Forrest, gave birth to their first child, Justin Eaddy. Mr. Eaddy, Ms. Forrest and Justin lived together as a family while Mr. Eaddy provided for them through his employment at Sacred Heart University. In March 2001, the couple's second child was born, Tianna Eaddy.

In 2001, Mr. Eaddy and his family faced some challenges. In late Spring, near the end of the academic year, Mr. Eaddy was laid off by Sacred Heart. In June, his son Justin nearly died when his intestines became entangled. For one month following life-saving surgery Justin was hospitalized at Bridgeport Hospital. Mr. Eaddy sat and slept with his then two-year-old son every day at the hospital while Ms. Forrest tended to newborn Tianna at home. Justin's illness occurred at a time when neither Mr. Eaddy nor Ms. Forrest had medical insurance.

So, at the same time that Mr. Eaddy was unemployed and dealing with the arrival of Tianna, Justin's illness and the resulting medical bills, it was probably inevitable that Mr. Eaddy would be tempted to make easy money by way of the illegal drug trade. It was at this time that Mr. Eaddy's sense of responsibility for his family caused him foolishly to start selling drugs again. However, this time Mr. Eaddy was selling narcotics to an undercover agent. In March

2002, Mr. Eaddy was arrested on this case.

### III. Involvement in the Offense

Between February 19 and March 13, 2002, Mr. Eaddy sold crack/cocaine and heroin to an undercover agent. During that time Mr. Eaddy was selling cocaine and heroin along with co-defendants Jose Robles and Raul Ayala. At the time of Mr. Eaddy's arrest, he was found to be in possession of crack/cocaine, powder cocaine and heroin.

### IV. Guidelines Calculation

As noted in the Department of Probation's Presentence Report, counsel for defendant and the Government mistakenly agreed in the July 23, 2002 Plea Agreement that defendant was a Career Offender and that pursuant to U.S.S.G. §4B1.1 the base offense level was 34. Based on an Adjusted Offense Level of 31 (accounting for a subtraction of three levels for acceptance of responsibility) and a Criminal History Category of VI, it was agreed that the applicable range was 188 to 235 months imprisonment and a fine between $125,000 and $2,000,000. The Plea Agreement noted defendant's express understanding that "the Court is not bound by this agreement on the Guideline and fine ranges specified [therein]."

After examining Mr. Eaddy's criminal history while preparing her Report, U.S. Probation Officer Jacqueline Carroll concluded that the undersigned and the Government were both in error when concluding that Mr. Eaddy was a Career Offender under the Guidelines. Upon further examination of Mr. Eaddy's record it was discovered that he did not have the requisite number of "controlled substance offenses" to qualify as a Career Offender pursuant to U.S.S.G §§4B1.1 and

4

4B1.2. The Department of Probation, the Government and the undersigned are now all in agreement that Mr. Eaddy should not be sentenced as a Career Offender and that this Court should not be bound by the erroneous calculation in the Plea Agreement.

The proper calculation is as follows:

| | |
|---|---|
| **Base Offense Level**[1] | 26 |
| **Acceptance of Responsibility** | - 3 |
| **Total Offense Level** | 23 |
| **Criminal History Category** | IV |
| **Guideline Range** | 70 - 87 months |

## V. Downward Departures

### A. Cooperation

Mr. Eaddy should receive a significant downward departure for having provided extraordinary assistance pursuant to U.S.S.G. §5K1.1. As described in the Government's motion, Mr. Eaddy was a crucial witness in an important case for the City of Bridgeport. He

---

[1]   As described in the Presentence Report, the net weight of cocaine base purchased and seized during the investigation into the instant offense was approximately 11 grams (an amount that included 2 grams of cocaine base seized from co-defendant Robles five months after the conspiracy ended and 19 days after defendant plead guilty pursuant to a cooperation agreement). However, Probation arrives at a Base Offense Level of 28 based on an unverified estimate of between 20 and 35 grams of cocaine base sold. Probation arrives at this 20 - 30 gram amount based on unspecified surveillance and unidentified informants.
   If a starting Offense Level was selected based on the net weight of cocaine base **actually** purchased and seized, U.S.S.G. §2D1.1(c)(7) dictates that the Offense Level is 26. The Guidelines suggest that the starting Offense Level should be based on the actual amount sold and seized, not on an unverified estimation. U.S.S.G. §2D1.1 appl. n.12. We believe that the starting Offense Level should be 26, not 28.

participated in numerous debriefings with Government agents, was the subject of a violent threat which occurred because he was mistakenly housed with Quin Powell and testified in the Grand Jury and at trial. His value as a witness was evidenced by the Government's decision to call him first among cooperating witnesses and to add a substantive count to their Indictment based on his testimony alone. Mr. Eaddy even helped Bridgeport detectives arrest a robbery suspect after he had obtained information regarding the suspect's whereabouts while in jail.

While Mr. Eaddy's active cooperation is now complete, he will, unfortunately, continue to live with the concern that his cooperation has jeopardized his own and his family's safety. Mr. Eaddy has already been subjected to one threat. His valuable cooperation and the risk it has brought into his life justify a significant departure.

### B. Pre-sentence Confinement Conditions

In appropriate cases pre-sentence confinement conditions may constitute the basis for a downward departure. U.S. v. Carty, 264 F.3d 191, 196 (2d Cir. 2001). Courts in this Circuit have granted departures when a defendant has been confined to state facilities which have been found to be "substandard" and "harsher" than federal facilities. U.S. v. Hernandez-Santiago, 92 F.3d 97, 101 n.2 (2d Cir. 1996)(noting where the district court granted a downward departure of three levels based on defendant's twenty-two months incarceration in a state facility which was found to be a "harsher" incarceration); U.S. v. Francis, 129 F.Supp2d 612, 614-619 (S.D.N.Y. 2001)(departure warranted to acknowledge the "qualitatively different, substandard conditions to which defendant was subjected for an extended period" while in custody at a state facility).

This court should depart downward on the basis of the substandard conditions Mr. Eaddy

had to endure in state prison facilities during the three years he has been awaiting sentence. Mr. Eaddy has been housed in five different state prison facilities in two different states during the more than three years he has been awaiting sentence. Mr. Eaddy's exceptionally long pre-sentence incarceration was necessitated by his course of cooperation and the numerous delays in the scheduling of the trial of Messrs. Powell and Walker. While Mr. Eaddy willingly agreed to cooperate, he had no reason to believe that his decision to cooperate would result in years of incarceration in facilities that exposed him to threats and poor health care. Nor did he expect that he would spend three years in state prisons and county jails that did not offer any programs or opportunities to work.

During his first year of incarceration Mr. Eaddy was housed in jails throughout Connecticut (Bridgeport, New Haven, Corrigan and Cheshire). Because Mr. Eaddy's identity as a cooperating witness had been disclosed long before trial, it was decided that Mr. Eaddy would be confined in jails not populated with federal prisoners. For months defendant was housed in Bridgeport and New Haven - jails used primarily for pre-trial detention that are not equipped to offer programs or employment for long term inmates. In both of these facilities defendant found that he was by far the longest serving inmate. He would watch his fellow inmates come and go with little to do but read the same few novels over and over.

In March 2003, Mr. Eaddy was transferred to the Corrigan facility. Here, despite the Government's intent to keep Mr. Eaddy separated from Mr. Powell, the two saw one another in a holding cell. It was during this encounter that Mr. Powell threatened Mr. Eaddy. Once the Government was made aware that Mr. Eaddy and Mr. Powell were in the same facility, Mr. Eaddy was moved to Cheshire. After a short stay at Cheshire, Mr. Eaddy was moved to a county

jail in Putnam County, New York. He has been in Putnam County jail for more than two years.

Again, the county jail in Putnam is populated by a pre-sentence and short term inmate population. The facility offers no programs or opportunities for employment. The facility has strict rules on amount of reading materials and other personal belongings. Mr. Eaddy has been by far the longest serving inmate in the facility. He has had to deal with debilitating boredom and painfully incompetent health care. In early 2004, Mr. Eaddy awoke one day to discover he had a toothache. About a week later the prison dentist arrived for his weekly visit and pulled out the tooth. Following this procedure Mr. Eaddy suffered an infection that caused excessive amounts of pain, bleeding and fever. This lasted for weeks without any adequate medical solution.

Mr. Eaddy's presentence confinement conditions in state facilities designed for short-term stays were noteworthy for the threat, boredom and inadequate medical treatment. There is no doubt that the conditions were substandard in comparison to the prison conditions endured by most who come before the Court for sentencing. The conditions justify a downward departure in this case.

**VI.    Conclusion**

A substantial downward departure is appropriate in this case. We respectfully urge the Court to exercise its discretion in fashioning a sentence that, while not minimizing the gravity of the instant offense, acknowledges Mr. Eaddy's substantial aid and assistance to the Government amidst challenging presentence confinement conditions and his genuine commitment to live his life as a law-abiding citizen and father.

        Respectfully submitted,

        ORETAGUS EADDY
        THE DEFENDANT

By:   /s/
        Stephen J. Fitzgerald  *(Fed. Bar #: ct22939)*
        GARRISON, LEVIN-EPSTEIN, CHIMES
           & RICHARDSON, P.C.
        405 Orange Street
        New Haven, Connecticut 06511
        (203) 777-4425 (telephone)
        (203) 776-3965 (facsimile)
        sfitzgerald@garrisonlaw.com

## CERTIFICATION

This is to certify that a true copy of the within and foregoing Sentencing Memorandum of Oretagus Eaddy was mailed this 16th day of August, 2005 by First Class mail, postage prepaid, to the following attorneys of record and interested party:

Alina P. Reynolds, Esq.
Assistant United States Attorney
United States Attorney's Office
Federal Building and U.S. Courthouse
915 Lafayette Blvd., Rm 309
Bridgeport, CT  06604

                                                      /s/
                                          Stephen J. Fitzgerald